Larry Norman ANDERSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 69134.

Court of Criminal Appeals of Texas, En Banc.

Oct. 9, 1985.

Rehearing Denied Dec. 18, 1985.

Joe Cannon, Kristine C. Woldy, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. and Don Clemmer and George Lambright, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

This is an appeal taken from a conviction of capital murder, V.T.C.A. Penal Code, § 19.03. The death penalty was imposed after the jury answered affirmatively the special issues submitted under Art. 37.071, V.A.C.C.P. Appellant alleges five grounds of error. We affirm the conviction.

In ground of error number one appellant contends that the evidence is insufficient to support a conviction for capital murder since there is evidence to support a theory other than that of appellant's guilt. In ground of error number three, appellant contends that there is no evidence to show that appellant committed the murder in the course of robbery. In order to address his contentions, a recitation of the facts is necessary.[1]

On December 10, 1981, appellant was released from an Arkansas penitentiary where he had been serving time for robbery and possession of stolen property offenses. He went to Houston, and was hired by his uncle, who allowed him to live in a kitchen that had been converted into a bedroom at his office. A few blocks away from appellant's room, Zelda Lynn Web-

ster, the deceased, was employed as the manager of She Lee's Lounge. A bartender at the lounge stated that appellant was a patron of She Lee's and had twice asked the deceased for a date. Both times the offer was refused.

On March 29, 1982, the deceased was tending bar and had placed her purse at the back of the bar. Just after midnight, appellant was seen in the bar. A short time later, Officer John Kleboski of the Houston Police Department was flagged down by two men on motorcycles and then went to the club.[2] He found the deceased's car parked alone in front of the club. The door to the club was open, and he found a flashlight on the floor. He was unable to locate anyone running the bar. He did find three "bikers" and one female inside the bar. After speaking with them, he called the owner of the club and asked her to meet him there. He noticed that the keys had been left in the keyhole of the trunk of the deceased's car.

At first when the owner arrived, she was not disturbed by the deceased's disappearance. The officer left and returned to his regular patrol. Later, however, when the owner found the deceased's shoes behind the bar, she became concerned. She looked into the trunk of the deceased's car and found the bar ledger and a shotgun, which belonged behind the bar, but no sign of the bank bags which were normally kept in the bar. The owner further testified that when the deceased usually left the bar after closing, she was to set the burglar alarm and lock the door. She would place the money taken in that night in a bank bag which she placed in her purse. When the club owner finally realized that things were amiss, she called the police and Officer Kleboski was again dispatched to the scene.

Meanwhile, at approximately 2:20 a.m. on March 30, Trooper Gary Stone of the Department of Public Safety was on routine patrol near the Addicks Dam in west Harris County when he received a report re-

---

1. We borrow liberally from the statements of facts in the briefs filed in this case.

2. The trial court sustained a hearsay objection when the State asked Stone what the men said to him when they flagged him down.

garding a vehicle driving without its headlights. Knowing that there were only three ways out of the area in which the vehicle had been seen, Stone drove on a route which he believed would bring him in contact with the suspicious vehicle. Stone had an unobstructed view of the roadway for approximately two miles ahead. Suddenly, at a distance of a quarter of a mile, Stone saw a vehicle's headlights being turned on. When the lights came on, Stone observed that the vehicle was already on the roadway and traveling in his direction. He stopped the vehicle.

When he approached the vehicle, Stone observed appellant behind the wheel. Stone saw that appellant's hands and clothes were covered with blood. Appellant explained that he had just been involved in a fight on Longpoint Drive. Stone patted down appellant's clothing for weapons, and placed him in his patrol car. Stone noticed that appellant had an empty knife sheath attached to his belt.

After calling for a back-up, Stone walked to the back of the pickup and saw fresh blood dripping from the tailgate. In the pickup, Stone saw a number of bloody paper towels and an overturned garbage can which contained a large amount of blood. Stone again talked to appellant who explained that he had been shooting rabbits but had thrown them away because they were too small.

Looking inside the cab, Stone found two money bags and a ski mask on the floor under some newspaper. Both bags were full of money, and appellant claimed that they belonged to him. Stone also discovered a lock-blade knife in the rear of the truck near the tailgate. The blade was covered with blood. Stone also observed a bloody fingerprint on the tailgate.

At 2:30 a.m., Officers Quinn and Ivy with the Houston Police Department arrived at the scene to assist Stone. Stone read appellant his rights and Quinn gathered evidence, including the bank bags, ski mask, knife, hair from the trash can, and dried blood from appellant's hands. The officers searched for evidence regarding appellant's claim that he had been shooting rabbits,

but nothing was discovered. At approximately 4:30 a.m., appellant was taken to the Houston Police Department Central.

After their arrival, Houston Police Department Detectives D.R. James and J.C. Mosier read appellant his rights and asked him if he knew anything about the deceased's disappearance. Appellant stated that he did not want to discuss the matter, but did consent to the taking of various samples and specimens.

The officers were with appellant in the crime laboratory until about 8:00 a.m. After the samples were taken and appellant's clothes were returned to him, and after the paperwork was completed, Quinn took appellant to the Municipal Courts Building, one block away from the police station. At 9:20 a.m., March 29, Judge C. Herdingsfelder advised appellant of his rights. Appellant indicated that he understood the warnings and did not wish to speak with an attorney. Quinn took appellant back to the homicide division.

When they returned to the police station, appellant was taken to a main office in the Homicide Division. Detective James asked appellant if he wanted to say anything about the case, and appellant declined. James immediately ceased questioning appellant, left him with Quinn as guard, and went to another part of the homicide division. During this interim the record is devoid of any mention of interrogation or even conversation between appellant and anyone at the station. A few minutes later, at approximately 9:45 a.m., Quinn called James and told him that appellant stated that he wanted to give an oral statement and requested that James return. James returned and again advised appellant of his rights.

Appellant told the officers that he had been involved in a drug transaction with the deceased, and that she had refused to pay him. Appellant indicated that he and the deceased engaged in sexual intercourse, after which she became hysterical and demanded that he return the money he had taken from her. At that point, he stabbed her to death and took her body to

the Addicks Dam area where he left it in a ditch.

The officers testified that prior to giving the statement, appellant was not subjected to threats or coercion, nor was he promised anything in return. He did not ask to speak with an attorney or ask that the interview be terminated. After he finished telling the officers what had happened, Mosier radioed the information to officers still at the crime scene, and gave them the information regarding the location of the body.

At approximately 10:00 a.m. on March 29, the officers found the body. There was a large amount of blood covering the deceased's shirt, and her shoes were missing. There were fifteen stab wounds to her chest, and marks on her wrists indicating that they had been bound.

On March 30, 1982, Houston Police Detectives Paul Motard and Steve Arrington met with appellant's aunt, Marion Martin. She took them to the home of her son, who had left on vacation and given appellant a set of keys so he could feed the dogs and make sure the house was secure. Earlier, she and her husband had found the deceased's purse sitting on top of appellant's jacket in their son's room. A bank bag was found inside the purse, and was identified, along with the other bank bags found in appellant's truck, as belonging to She Lee's Lounge. All three bags were filled with money.

Arrington next went to appellant's uncle's office, where appellant had been living. Outside the building, Arrington found a single plastic trash can. Next to the can, Arrington found a circular mark on the ground indicating that possibly another trash can had been removed from the area. Inside appellant's room, Arrington found what appeared to be blood stains on the floor and three pieces of white shoe-lace material which had been tied to form a small loop. Traces of type A blood were found on the laces.

Don Krueger, a chemist and toxicologist employed by the Houston Police Department, examined the physical evidence removed from appellant and his truck. The blood found on the trash can, pickup-bed, knife, and appellant's hands and clothing was determined to be type A, the same as the deceased's blood type. Appellant has type O blood. Krueger took samples of the blood found in appellant's room, and determined that it was type A.

Appellant testified at trial and stated that as of March 28, 1982, he had known the deceased for approximately one month. On that date, he went to the She Lee's Lounge to collect five thousand dollars which the deceased owed him as a part of a drug deal. He arrived there at 11:30 p.m., and waited until he was alone with her. Since he expected to be paid, he was surprised to see the deceased leave the lounge. He demanded his money, but she refused and walked out of the lounge. He followed her and watched as she placed a shotgun in the trunk of her car. After a brief argument, he convinced her to go back inside the club so that they could talk.

Once inside the club, the deceased agreed to get him the money. She walked to the door, however, and after he walked after her, locked it. They had an argument, and appellant convinced her to go back into the club and discuss the matter. She then agreed to get him the money.

Next, appellant stated (without further elaboration) that they got into the truck and went to his cousin's house. Appellant stated that when they went inside, the deceased sat on the bed and began disrobing. They engaged in sexual intercourse and appellant asked her if she was ready to get the money. She said no, and that he "should not have raped" her. She told him that if he did not leave her alone, she would call the police and have him sent to prison. He responded that he had to have the money. She walked toward the telephone, and appellant jumped in front of her.

Although appellant was upset, they agreed to go back to the club. He convinced her that they should stop at his uncle's business office, where appellant was living, and discuss the matter once more. They entered the building and went to the room where appellant slept. He

resumed his pleas for payment, but she refused. She demanded to be taken back to the club, and began walking toward a phone in the next room. Appellant grabbed her, a fight ensued, and he stabbed her with a knife he wore on his belt. After he determined that she was dead, he tied her wrists and ankles together and stuffed her body in the trash can. During the testimony, appellant denied knowing about the money bags.

On cross-examination, appellant stated that he had received the pills involved in the drug deal from a dangerous individual. He stated that he had to get the money to pay the man. No other defense evidence was presented.

Sufficiency of the evidence to support a conviction is measured by the standard established in *Jackson v. Virginia,* 443 U.S. 307, 319, n. 12, 99 S.Ct. 2781, 2789, n. 12, 61 L.Ed.2d 560 (1979): "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard is applied in both direct and circumstantial cases. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Cr.App.1983), opinion on State's motion for rehearing at 449. See also *Bradley v. State,* 691 S.W.2d 699 (Tex.Cr.App. 1985) at 703.

We apply this standard and determine whether a rational trier of fact could have found the elements beyond a reasonable doubt by examining the evidence and determining if it supports an inference other than the guilt of the accused. *Carlsen,* supra at 449. As stated by Judge Clinton in *Carlsen, id.,* "if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding."

In the case before us, appellant contends that the evidence is insufficient because the defense allegations that the murder was committed because the deceased became hysterical and threatened appellant rebut the State's circumstantial evidence that the murder occurred in the course of robbery. He also contends that there is no evidence showing that the murder was committed in the course of robbery. Viewing the evidence in the light most favorable to the prosecution, however, we find that there was sufficient evidence to sustain the jury's finding.

Initially, the evidence shows that the deceased left the bar under suspicious circumstances: she left without her shoes, the door to the club was left open, and the keys to her car were left inserted in the trunk. The usual procedures had not been followed in closing the club. Moreover, two of the money bags belonging to the club were found in appellant's truck, and the third was found inside the deceased's purse at his cousin's house where he had taken the deceased. Also, appellant told the police officers that he had killed the deceased after she became hysterical and demanded that he return the money he had taken. Last, he stated during his testimony that he "had to have the money," presumably to pay back the dangerous person from whom he had obtained the drugs. Thus, there was evidence presented, although circumstantial, that the murder was committed in the course of a robbery. This evidence would have enabled a rational trier of fact to find beyond a reasonable doubt that the murder was committed in the course of a robbery.

Appellant also alleges that the evidence is insufficient since it supports a drug transaction as well as a robbery which thereby establishes a hypothesis other than that of appellant's guilt. Appellant confuses the standard for review in a circumstantial evidence case with the manner of its application. An alternate hypothesis of guilt is not a standard by which evidence sufficiency is measured: it is a "guidline for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Carlsen,* supra at 450. Thus, simply because appellant presented a different version of the events, the evidence is not rendered insufficient.

Moreover, the jury was the ultimate trier of fact. As such, it had the duty of resolv-

ing conflicting testimony and the option of accepting or rejecting appellant's evidence. Simply because the jury found appellant's evidence unconvincing is not grounds for finding insufficient evidence to support the verdict. We find that there was sufficient evidence to support a rational trier of fact's finding that the State had proved the essential elements of the offense. Appellant's first and third grounds of error are overruled.

In his second ground of error, appellant contends that the trial court erred in admitting into evidence items seized as the result of the search of his pickup truck because there was no probable cause to support the initial stop. The search was illegal, according to appellant, because Officer Stone had no more than a hunch when he stopped appellant. The record reflects that a hearing was held outside the presence of the jury where Officer Stone testified to the following:

"Q. [Prosecutor] So then just to back up, I take it the reason the Defendant's vehicle was stopped was because of the fact he was driving without his headlamps?

"A. Yes, sir. And I came over the dam, you can see approximately two miles down the road. And at that time the vehicle was not two miles down the road because I travelled approximately one hundred to one hundred and fifty yards and then I saw headlights.

"Q. When these headlights came on, was the vehicle in the road?

"A. When I saw the headlights, it was already in the road.

"Q. And the vehicle was moving as the headlights came on, is that correct?

"A. Yes, sir.

. . . . .

"Q. [Prosecutor] When you saw these lights come on, was the vehicle travelling towards you at the time these lights came on?

"A. Yes, sir.

■ In order to justify an investigative stop, officers must have specific, articula-ble facts, which in the light of their experience and general knowledge, together with rational inferences from those facts, would reasonably warrant the intrusion. *Glass v. State*, 681 S.W.2d 599 (Tex.Cr.App.1984), and cases cited therein at 601. Mere suspicion, however, is not sufficient. *Id.* The articulable facts used by the officers must create a reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication that the unusual activity is related to crime. *Meeks v. State*, 653 S.W.2d 6 (Tex.Cr.App.1983), citing *Schwartz v. State*, 635 S.W.2d 545 (Tex.Cr. App.1982).

■ In the case before us, the officer testified that he had received a report regarding a vehicle driving on the roadway without headlights. After stationing himself to intercept the vehicle, the officer saw the lights come on as the vehicle proceded toward him. Since driving without headlights is an offense under Art. 6701d, § 109(a), V.A.C.S., Officer Stone had probable cause to stop the vehicle. C.f. *Tunnell v. State*, 554 S.W.2d 697 (Tex.Cr.App.1977) (officer had no purpose in requesting defendant to present driver's license). The trial court did not err in holding that the stop was permissible. Appellant did not contend at trial that his subsequent arrest and the search of his vehicle were unauthorized. Appellant's second ground of error is overruled.

In ground of error number four, appellant contends that the Texas death penalty procedures are unconstitutional in that they provide no avenue for obtaining a meaningful response from the jury concerning relevant mitigating factors, citing *Spivey v. Zant*, 661 F.2d 464 (5th Cir.1981), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982).

■ In order to be constitutional, a capital murder sentencing procedure must allow the jury to consider all relevant mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The death penalty procedures followed in

this State have been heretofore found constitutional since the jury is asked to consider mitigating factors. *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980).

Appellant's reference to *Spivey*, supra, does not lead us to a different result. In *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr. App.1984), at 121, we considered and rejected a similar argument: we are not bound by decisions of lower federal courts, *Flores v. State*, 487 S.W.2d 122 (Tex.Cr.App.1972), and *Pruett v. State*, 463 S.W.2d 191 (Tex. Cr.App.1971), and Art. 37.071 V.A.C.C.P. allows the jury to consider mitigating evidence. We see nothing new to affect application of stare decisis in this area.[3] Appellant's fourth ground of error is overruled.

In his fifth ground of error, appellant contends that the trial court erred in admitting evidence of his oral confession in violation of Art. 38.22(c), V.A.C.C.P., which provides that an oral statement made by an accused "which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused" shall be admissible. Appellant argues that since the confession does not "clearly and unequivocally admit the commission of the offense charged," it should not be admitted, citing *McDaniel v. State*, 144 Tex.Cr.R. 168, 161 S.W.2d 1064 (Tex.Cr.App.1942). Appellant does not contend in this ground that the confession was given involuntarily or unknowingly.

In *McDaniel*, supra, the defendant was charged with stealing $60.00 from L. Krumnow. The defendant made a confession where he admitted taking $28.00 from someone, but not specifically L. Krumnow. During trial, the defendant took the stand and repudiated the confession. We held that the evidence was insufficient to support the conviction where the State relied upon a confession which did not unequivocally relate to the crime charged. Thus, *McDaniel* relates to evidence sufficiency, and not to admission of oral statements

under exceptions to the recording requirement of Art. 38.22, supra.

Moreover, we find no authority for appellant's assertion that in order for a confession to be admissible as conducing to establish the guilt of the accused, the defendant must clearly admit commission of the *entire* crime. Art. 38.22(c), supra, allows admission of unrecorded statements made under custodial interrogation if they contain assertions of fact which tend to establish guilt. See *Carter v. State*, 650 S.W.2d 843 (Tex.App.Houston [14th] 1982, no writ). Moreover, the entire statement is admissible. See *Gifford v. State*, 630 S.W.2d 387 (Tex.App.Austin 1982), at 390, citing *Marini v. State*, 593 S.W.2d 709 (Tex.Cr.App.1980)). We find no requirement, however, that the statement contain admissions as to the whole crime.

In the case before us, appellant's statements led to the discovery of the deceased's body. Thus, the statements were admissible under Art. 38.22(c), supra. The trial court did not err in admitting the evidence of appellant's oral statement. Appellant's fifth ground of error is overruled.

By supplemental brief, appellant adds the following to his fifth ground of error: he contends that the facts do not support the trial court's ruling that the confession was given voluntarily. Appellant argues that the confession was tainted by the illegal stop, and that since appellant's request to terminate the interview was not honored, the confession was not voluntarily given.

Initially, since we have found that the officer was justified in detaining appellant, there was no illegal stop to taint appellant's subsequent statements. See discussion, supra. Also, the record supports the trial court's determination that appellant was properly warned in compliance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and Articles 38.22 and 15.17, V.A.C.C.P. Also, the record supports the court's finding that

---

**3.** The author of this opinion has heretofore bowed to stare decisis in this matter. See the

concurring opinion by Clinton, J., in *Johnson v. State*, 691 S.W.2d 619 (Tex.Cr.App.1985) at 627.

appellant voluntarily waived his rights and after initially exercising his right to remain silent, initiated of his own free will a conversation with the detectives. Thus, the court's ruling will not be disturbed on appeal. See *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr.App.1983); *McKittrick v. State,* 541 S.W.2d 177 (Tex.Cr.App.1976). See also *Faulder v. State,* 611 S.W.2d 630 (Tex. Cr.App.1980), *cert. denied* 449 U.S. 874, 101 S.Ct. 215, 66 L.Ed.2d 95 (1980), opinion on State's motion for rehearing; and *Sinegal v. State,* 582 S.W.2d 135 (Tex.Cr.App. 1979). Appellant's contentions are overruled.

■ By supplemental brief, appellant alleges an additional new ground of error, and contends that the trial court erred in denying his challenge for cause to venireperson Doris Green. The record reflects that, when questioned by the State's attorney, Green indicated that she would not automatically vote for the death penalty, and would consider the facts. During defense examination, Green stated that she believed that "if that person committed that crime with intent to kill that individual, then yes, he should be [given the death penalty], but if that person killed that person without intentions of doing so, then alterations should be made in his punishment." On further questioning, Green stated that she believed the defendant was innocent until proven guilty and that she would not hold a defendant's failure to testify against him. Appellant's counsel then challenged Green "on [her] ... statement that she felt in any murder if the murder was proved beyond a reasonable doubt that the death penalty should result." The court overruled the challenge.

Based upon the testimony, Green was not disqualified under *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) or *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). She never stated that she would disregard the evidence and not follow the law or her oath as a juror. Moreover, due deference must be given the trial court's determination given his position to gauge Green's demeanor and sincerity. See *Goodman v. State,* 701 S.W.2d 850 (Tex.

Cr.App.1985); *Franklin v. State,* 693 S.W. 2d 420 (Tex.Cr.App.1985). No error is shown. Appellant's sixth ground of error is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in the result.

TOM G. DAVIS, J., not participating.