Barbara L. WILFORD, Appellant,

v.

The STATE of Texas, Appellee.

No. 63787.

Court of Criminal Appeals of Texas, En Banc.

Nov. 12, 1987.

J.B. Williamson, LaPorte, Allen C. Isbell, (on appeal only), Houston, for appellant.

John B. Holmes, Jr., Dist. Atty. & Larry P. Urquhart & Jack Frels, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction for murder. Punishment was assessed by the jury at confinement for life.

We shall first consider appellant's challenge to the sufficiency of the evidence to sustain her conviction in this circumstantial evidence case.

The victim in this case, Anne Jones, was the wife of T.C. Jones, a Harris County deputy sheriff who held the rank of Captain. In February of 1978 Captain Jones met appellant at the Houston Livestock Show and Rodeo. That night Jones took appellant out for dinner. At that time appellant was living in the Dallas area, but she later moved to Houston.

Without going into every detail, a love affair developed between Captain Jones and the appellant. Jones made it clear to the appellant that he was not going to leave his wife. The relationship continued until the end of November 1978, at which time the appellant broke off her relationship with Jones.

On December 12, 1978, Anne Jones was found at her residence in Houston. She had been shot in the head with a .38 caliber gun. Her body was found lying in the front of her residence. No witness saw the shooting take place.

Mary T. Hull, a neighbor of the Jones', was at her residence on December 12, 1978 around 6 p.m. Hull observed a vehicle going slowly down the street where the Joneses lived. Hull described the vehicle as being light beige. The vehicle had a malfunctioning headlight on the right side and Hull observed the light flickering. After seeing the car, Hull heard a gunshot. Hull went outside her residence and observed a figure lying on the porch of the Jones' residence. Hull went to the Jones' residence and saw Anne Jones lying on the porch. George and Millie Hilburn, the next door neighbors of the Joneses, were there when Hull arrived.

The next day Hull went to a police station and observed a station wagon. This station wagon was similar in color to the one she had seen the night before. Hull also observed the lights on the vehicle and testified that the malfunctioning of the lights appeared exactly as she had observed the night before. Hull also testified that when a police officer kicked the bumper, the lights worked in a normal manner.

Kerry Stamey testified that on December 12, 1978 between 6:10 and 6:15 p.m. he went down Tam O'Shanter, the street on which the Joneses lived, on his way home from work. Stamey was riding a motorcycle. As he was going down Tam O'Shanter, he observed a light colored, possibly tan, station wagon. A person was leaning into the station wagon through an open door, apparently removing some item or items from the vehicle.[1]

Millie Hilburn testified that she and her husband lived next door to the Joneses. On December 12, 1982, she received a phone call from Anne Jones around 6 p.m. During the course of this phone call, Millie Hilburn told Anne Jones "whatever you do, don't let her in" and "don't open the door, whatever you do." Millie Hilburn sent her husband over to the Jones' residence while this conversation was going on. Millie Hilburn then went over to the Jones' residence. She observed a vehicle start up and leave the area. The vehicle was a light-colored station wagon. Millie Hilburn also observed Anne Jones lying on the front porch. Millie Hilburn went to the Houston Police Department the next day and observed a vehicle similar in color and size to the one she had seen the night before.

George Hilburn also testified. He was at home on December 12, 1978 around 6 p.m. He heard the phone ring; his wife, Millie, answered it. After the phone call, he went next door to the Jones' residence, where he found the body of Anne Jones. George Hilburn also observed a light brown station wagon burn its tires as it left from in front of the Jones' residence. George Hilburn also went to the police

---

**1.** We note appellant objected to this response as conjecture, but failed to obtain any ruling from the court.

station the next day with his wife and observed a vehicle which he said was similar in size and color to the one he saw the night before.

Roma Knapp was a friend of appellant. In addition to testifying concerning the relationship between Captain Jones and appellant, Knapp also testified about the events of December 12, 1978. On that date, appellant had gone to the Knapp residence for lunch. At that time, appellant borrowed the Knapp vehicle which was a Dodge Aspen station wagon, tan in color. In exchange, Knapp took appellant's vehicle. Knapp testified that appellant's vehicle was a Chevrolet and was in operating condition on that date.

Later that night, at about 10:30 p.m., Knapp talked to appellant by telephone. At that time, the Knapp vehicle was back at her residence. Appellant asked Knapp not to tell whoever brought her from work to pick up her car the next day why she had borrowed the station wagon because she had told her co-workers her vehicle was being repaired. The next day appellant again called Knapp and asked her not to tell anyone that she had borrowed the Knapp vehicle on the preceding day.

Knapp later called her minister about what she knew and then went to talk to him. At the church, Knapp met with her minister and homicide detectives. Knapp permitted the detectives to take her car. The detectives later recovered some clothing and a pair of tennis shoes from a trash can at the Knapp residence. These items were identified as belonging to appellant.

Knapp also testified that the right front headlight on the station wagon did not work properly, but that if you got out of the car and kicked the bumper, the light would then function properly.

David Knapp, Roma's husband, was also called to testify by the State. On December 12, 1978, he had gone to a Christmas party with his wife and children. They had met at the party and were in separate vehicles. David Knapp arrived home from the party before his wife. At that time, appellant was at the Knapp residence in the Knapp's tan station wagon. David Knapp took appellant to her residence and left her there. He verified that the right front light on the station wagon malfunctioned, and that they had to bang on it to get the light to work properly.

Joette Landrum, who worked with appellant at Living Windows Corporation, testified that on December 12, 1978, shortly before noon, appellant talked to her and told her that her (appellant's) car would not start, and that she had borrowed a friend's car. Appellant left Living Windows in a light-colored station wagon.

Jacqueline Fountain also worked with appellant at Living Windows. Appellant called her around 3:30 p.m. on December 12, 1978 and told her that she (appellant) had had car trouble and would not be coming back to work that afternoon. Later in the evening, appellant called Fountain and asked to spend the night with her, stating she (appellant) still didn't have her car and needed a ride to work in the morning. Appellant gave Fountain a poinsettia for a Christmas present when Fountain picked appellant up that evening to bring her back to Fountain's residence.

Jing S. Hong owned a flower shop in Houston called Top Florist. On December 12, 1978, Hong sold two poinsettias to a female patron. This customer wrote a check for the poinsettias, and showed a driver's license for identification, which number was recorded on the check. That driver's license number was the same as appellant's, which license appellant had in her possession when arrested on December 13, 1978.

Arthur D. Queen, a questioned documents examiner for the City of Houston Police Department, compared the handwriting on the check used to pay for the poinsettias with known handwriting samples from appellant. In Queen's opinion, the check used to pay for the poinsettias had been written by appellant.

Thomas Mack, Jr., a City of Houston police officer, arrived at the scene of the

murder shortly after 6:30 p.m. He observed two poinsettia plants sitting at the feet of the deceased. Hong testified that these two poinsettias came from her shop based upon the baskets the plants were in, the color of the ribbons, and the way she had tied the ribbons.[2]

Through firearm transaction records, it was proven that appellant had purchased a .38 caliber Colt pistol on July 15, 1976. On that same date, appellant also purchased some hollow point bullets. In September of 1978, appellant reported this weapon stolen to Captain Jones, who prepared an offense report concerning the weapon. However, shortly before Thanksgiving in 1978, Roma Knapp and appellant drove to Florida in appellant's car. Knapp at that time observed a pistol in the glove compartment of appellant's car. Knapp testified that this gun looked like the .38 caliber pistol she had seen appellant possess before.

David Knapp, Jr., the son of Roma, testified that he knew appellant and had seen her with a .38 caliber pistol in the past. David Knapp, Jr., testified that appellant used hollow point bullets in her gun.

After the commission of the offense, a search of an overnight bag that appellant had left at Fountain's residence led to the recovery of a single hollow point bullet.

A search of appellant's residence led to the recovery of a styrofoam pistol case marked Colt and .38 caliber hollow point bullets, as well as other items. The bullets that were recovered were all Smith & Wesson brand. The weapon used in the slaying of Anne Jones was not located.

C.E. Anderson, a firearms examiner from the Houston Police Department, examined the bullet removed from Anne Jones. He testified that in his opinion the bullet was fired from a Colt weapon. He also testified that the bullet in question was manufactured by Smith & Wesson and was a hollow point.

The pathologist who conducted the autopsy on Anne Jones testified that the

wound was made by a hollow point bullet fired at close range, six to 20 inches.

When appellant was arrested, the address of Captain Jones and Anne Jones was found written on a piece of paper in her purse.

"A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of guilt of the defendant.... Thus proof which amounts only to a strong suspicion or mere probability is insufficient...." *Flanagan v. State*, 620 S.W.2d 591 (Tex. Cr.App.1981). (Citations omitted.)

"Every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction ... The rule has long been that a conviction on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the accused, and proof amounting to only a strong suspicion or mere probability is insufficient...." *Stogsdill v. State*, 552 S.W. 2d 481 (Tex.Cr.App.1977). (Citations omitted.)

"Each fact need not point directly and independently to the guilt of the accused, however, as the cumulative effect of all the incriminating facts may be sufficient to support the conviction." *Plunkett v. State*, 580 S.W.2d 815 (Tex.Cr.App.1979); *Easley v. State*, 564 S.W.2d 742 (Tex.Cr. App.1978).

Subsequently in *Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Cr.App.1984), it was written:

"The Court of Appeals' decision was handed down *before* the mandates issued in this Court's opinions in *Wilson v. State*, 654 S.W.2d 465 (Tex.Cr.App.1983), *Denby v. State*, 654 S.W.2d 457 (Tex.Cr. App.1983), *Freeman v. State*, 654 S.W.2d 450 (Tex.Cr.App.1983), and *Carlsen v. State*, 654 S.W.2d 444 (Tex.Cr.App.1983).

---

2. The poinsettia given to Fountain was shown   not to have been purchased at the Top Florist.

"In those cases, this Court held that the standard for reviewing sufficiency of the evidence questions on appeal is the same for direct and circumstantial evidence cases. Further, the relevant standard is the one developed by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to-wit, 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'

"In *applying* the above standard of review the court agreed that the 'exclusion of outstanding reasonable hypotheses' test would still be utilized. The opinion on rehearing in *Denby* noted that, 'if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding.' 654 S.W.2d at 456. Similarly, the *Denby* concurrence stressed that, 'Logic dictates that if there is a "reasonable hypotheses" other than the guilt of the accused, then it cannot be said that the guilt has been shown "beyond a reasonable doubt." ' 654 S.W.2d at 457. In *Wilson, Denby, Freeman,* and *Carlsen,* this Court also firmly rejected the notion of a presumption *on appeal* of an accused's innocence in circumstantial evidence cases."

And in *Anderson v. State*, 701 S.W.2d 868 (Tex.Cr.App.1985), it was stated:

"An alternate hypothesis of guilt is not a standard by which evidence is measured: it is a 'guidline (sic) for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *Carlsen*, supra at 450. Thus, simply because appellant presented a different version of the events, the evidence is not rendered insufficient."

In the instant case there was no evidence or other hypothesis than that of appellant's guilt. From the cumulative force of all the incriminating circumstances and facts the evidence, viewed in the light most favorable to the jury's verdict, is sufficient for any rational trier of fact to have found beyond a reasonable doubt all the elements of the crime charged against the appellant. The challenge to the sufficiency of the evidence is overruled.

In three grounds of error appellant contends that the trial court impermissibly limited her cross-examination of T.C. Jones in violation of her right to confront witnesses guaranteed by the Sixth Amendment to the United States Constitution. She urged the integrity of the fact-finding process was jeopardized by the court denying the right to cross-examine Jones as to his involvement with other women, whether he had an "open" marriage, and whether the deceased might have been involved with other men.

On cross-examination of T.C. Jones in front of the jury, the following transpired:

"Q (By Mr. Isbell) Are you familiar with the concept of open marriage, Capt. Jones?

"MR. FRELS: Object to that. It has no relevancy in a murder trial.

"THE COURT: Sustained.

"Q (By Mr. Isbell) The relationship with Barbara Wilford was not the first such relationship you had since you were married, is that correct?

"MR. FRELS: That has no materiality and no relevancy in this case.

"THE COURT: That's sustained.

"Q (By Mr. Isbell) At the time that Barbara Wilford lived in Louisville, were you also going out socially with other women besides your wife?

"MR. FRELS: Object to that and every line of questioning that has anything to do with that.

"THE COURT: I have sustained the objection. Get on to something else. If you want a bill on it in the absence of the jury, you may do so.

"MR. ISBELL: So I may be clear on the Court's ruling, do I understand

that I cannot explore a relationship with Capt. Jones except the defendant for the record?

"THE COURT: I think that's the effect of my ruling, yes, sir."

Later outside the presence of the jury appellant was permitted to try and make a bill of exceptions and the following took place:

"Q  Capt. Jones, Barbara Wilford was not your first relationship with other women outside of your marriage with Ann Jones and your previous marriage?

"MR. FRELS: May we approach the bench, your Honor.

"THE COURT: Yes.

"MR. FRELS: Your Honor, this is clearly inadmissible and immaterial and would be an abuse. We ask if this is to be done, it be done in your office.

"THE COURT: Sustain the objection. I don't think it's material on the bill. I'm not going to permit you to ask questions of the witness.

"MR. ISBELL: Of this witness?

"THE COURT: No, sir, but *I want you to dictate in the record what you expect to prove.*

"MR. ISBELL: I think it's a relevant area. He kept speaking of his attitude towards his wife.

"THE COURT: I may be wrong on the law, but I don't believe it's material.

"MR. ISBELL: May I dictate in the record the court will not allow me to perfect the bill in asking him questions by asking about his involvement with other women besides marriage, besides Barbara Wilford, before meeting Barbara Wilford and during the time he met Barbara Wilford?

"THE COURT: The record will so reflect this would be your area of interest.

"MR. ISBELL: May I have just a moment?

"THE COURT: Yes.

"MR. ISBELL: The other question that I asked and, if the Court would rule that it would be embraced by the other, would be his understanding of open marriage, whether his relationship with Ann Jones would be that of an open marriage.

"THE COURT: Ask the question.

"Q  (By Mr. Isbell)  Are you acquainted with the term open marriage?

"A  I am not.

"Q  Would you characterize your marriage with Ann Jones as your understanding that you had the opportunity and her consent to be involved with other women?

"MR. FRELS: I object to that. For the record, it's immaterial and irrelevant for any possible issue in a murder trial involving another person.

"THE COURT: Sustain the objection.

"Q  (By Mr. Isbell)  You kept your relationship with Barbara Wilford a secret from your wife intentionally; is that correct?

"A  Yes, sir.

"Q  And as far as you know, your wife did not have relationships with other men?

"MR. FRELS: Object to that and I think we're getting past the point of abuse here.

"THE COURT: I sustain the objection even for the purposes of the bill. You have your record on my refusing to permit you to make a bill.

"MR. ISBELL: May I state that I would inquire to his knowledge of any relationship that Ann Jones might have had?

"MR. FRELS: And I object to that.

"THE COURT: I ruled on it.

"MR. ISBELL: For the record, your Honor, Mr. Frels, in the presence of a full courtroom, went into the business about three years ago my client wanting an alleged hit man and, as a consequence, the papers picked up the high-

ly inflammatory information against my client which any reasonable prosecutor would know that they would and I object to his interference with my trying to make a bill in the privacy of this bench.

"MR. FRELS: I'm not objecting to making a bill. I'm objecting to the type of questions and inquiries into the personal life of a lady who has been killed and her husband and I'm going to rely on the Court's discretion and experience as to why I went into those matters concerning a Johnny Coppa and a possibility of killing a Jack Dietz' wife and I feel that is far more relevant than what is being inquired into here.

"THE COURT: I ruled on the basis of what I believe the law to be on the objections being made. One of the good things about the trial of a case is that we can vent some of our feelings and get to act as a lawyer but still, I respect the right of either lawyer to advance his belief and contentions in support of his client. So I hope with that, we can move along.

"MR. ISBELL: So the record will be clear on appeal, the area I was going to explore, which the court is not allowing me to ask questions for this bill is the relationship the deceased might have had with other men at the period of time in the months preceding her death and I understand I cannot ask that. I understand the Court's ruling and that I'm being deprived of that cross examination." (Emphasis supplied.)

Article 40.09, § 6(d)(1), V.A.C.C.P., at the time of appellant's trial, provided that:

"When the court refuses to admit offered testimony or other evidence, the party offering same shall as soon as practicable but before the court's charge is read to the jury be allowed, out of the presence of the jury, to adduce the excluded testimony or other evidence before the reporter, and a transcription of his notes showing such testimony or other evidence and any objections and exceptions of the party offering same shall, when certified to by the reporter and included in the record, establish the nature of such testimony or other evidence, and the objections and exceptions made in connection with the court's exclusion of such testimony or other evidence and no bills of exception shall be essential to authorize appellate review of the question whether the court erred in excluding such testimony or other evidence. *The court, in its discretion, may allow an offer of proof in the form of a concise statement by the party offering the same of what the excluded evidence would show,* to be made before the reporter out of the presence of the jury as an alternative method of causing the record to show such excluded testimony or other evidence, and in the event the record contains transcription of the reporter's notes showing such an offer of proof the same shall be accepted on appeal as establishing what such excluded testimony or other evidence would have consisted of had it been admitted into evidence." [3]

■ We note that appellant has not shown what answers she expected to elicit from T.C. Jones. As can be seen from the above excerpt of the transcript, the trial court instructed appellant to dictate into the record what the expected answers of T.C. Jones would have been. This appellant did not do, but attempted to question Jones about these matters.

We observe that even if cross-examination of Captain Jones was limited, appellant did not perfect a bill of exceptions or make offer of proof in accordance with Article 40.09, § 6(d)(1), V.A.C.C.P., and nothing is presented for review. *Toler v. State,* 546 S.W.2d 290 (Tex.Cr.App.1977); *Ross v. State,* 523 S.W.2d 402 (Tex.Cr.App.1975).

In *Moosavi v. State,* 711 S.W.2d 53, 55 (Tex.Cr.App.1986), it was written:

---

**3.** Emphasis added by the author unless otherwise noted.

"The vast majority of cases dealing with Art. 40.09, Sec. 6(d)(1) impose no formal requirements on offers of proof. For example, in *Passmore v. State*, 617 S.W.2d 682 (Tex.Cr.App.1981), the defendant failed to make a bill of exception or offer of proof. This Court held that no error was preserved because '[a]ppellant did not ... proffer proof to show what Chambers' testimony would have been.' *Passmore*, supra, at 685. Nowhere in *Passmore*, supra, is it required that offers of proof be in question and answer form.

"Similarly, in *Toler v. State*, 546 S.W.2d 290 (Tex.Cr.App.1977), the defendant failed to make a bill of exception or offer of proof 'to show what the testimony would have been if she had been permitted to elicit such answers.' *Toler*, supra, at 295. The Court held no error was preserved but did not require that an offer of proof be in question and answer form. See also *Riles v. State*, 595 S.W.2d 858 (Tex.Cr.App.1980); *Chambers v. State*, 568 S.W.2d 313 (Tex.Cr.App.1978); *Ross v. State*, 523 S.W.2d 402 (Tex.Cr.App.1975); *Stein v. State*, 514 S.W.2d 927 (Tex.Cr.App.1974); *Garcia v. State*, 513 S.W.2d 82 (Tex.Cr.App.1974); *Davison v. State*, 510 S.W.2d 316 (Tex.Cr.App.1974)."

While it would have been better practice to have permitted the appellant to perfect her bill of exception by questions and answers, she was permitted to make offer of proof and did not do so and preserved nothing for review.

Appellant also argues that she was attempting to show that other women besides herself had a motive to kill Mrs. Jones. An examination of the record reveals that this contention was never presented to the trial court, and the ground of error presents nothing for review. *Bouchillon v. State*, 540 S.W.2d 319 (Tex.Cr.App.1976).

■ Appellant in a ground of error argues that the prosecutor committed reversible error in his summation to the jury at the guilt-innocence phase of the trial.

The complained of argument was:

"Barbara Wilford is here today because of only two reasons in my mind. Number one, she made the type of mistakes murderesses make. She had the type of flaws that a murderer has that always leads to apprehension. It may take more than one day. Fortunately that's all it took in this case. It may take weeks, months or years, but a murderer's basic flaws always lead to that person's apprehension. She made the State's—"

Appellant objected that the argument was outside the record when the prosecutor stated that murderers are always caught. This objection was overruled.

We agree that this argument was not based on evidence admitted during the trial, and constituted the personal opinion of the prosecutor that murderers are always caught. However, in order for an improper jury argument to constitute reversible error, it must be either extreme or manifestly improper or inject new and harmful facts. *Duffy v. State*, 567 S.W.2d 197, 206 (Tex.Cr.App.1978); *Kerns v. State*, 550 S.W.2d 91 (Tex.Cr.App.1977). In the instant case, we cannot conclude that the argument, while improper, is one that calls for reversal.

■ In another ground of error, appellant contends that reversible error was committed when the prosecutor misstated the evidence during summation at the guilt-innocence stage of the trial.

At the trial the following argument was made:

"And what did Jing Hong tell you about those two poinsettias? And probably the most convincing piece of evidence in this case or any other case by a lay citizen, those two poinsettias were sold to the woman who gave her the check."

Appellant objected to this argument as being outside the record. The objection was overruled.

A reading of the record reveals that while Jing Hong could not identify appel-

lant as the purchaser of the poinsettias in question, she was able to identify the check used to pay for two poinsettias purchased from her by a woman and appellant's driver's license which was used by the female purchaser of the poinsettias. Hong had written down appellant's driver's license number on the back of the check. And when appellant was arrested and taken to jail, her checkbook revealed that a check had been written to Top's Florist on the date in question. Hong further identified the two poinsettias found at the scene as being purchased from Top's Florist. The argument complained of was based upon evidence or a reasonable deduction from evidence admitted during the trial and no error is shown.

■ In two related grounds of error appellant contends that reversible error occurred at the punishment phase of the trial when the following transpired during the prosecutor's argument:

"Five years in the penitentiary? Ten years in the penitentiary? Forty years in the penitentiary? Sixty years, eighty years, something less than the death penalty, life in prison? What is proper? What would be the appropriate punishment for the coldest, foulest murder that you'll ever hear? I haven't cried since my father passed away, but I cried last night, alone. Nobody saw me.

"MR. HENSLEY: Objection, your Honor, outside the record.

"THE COURT: He's entitled to make his final plea to the jury. Objection overruled.

"MR. HENSLEY: His reaction and his belief which he is stating indirectly is not only outside the record but violates the Canons of Ethics. I ask for a ruling.

"THE COURT: Sustain your objection.

"MR. HENSLEY: Request the Court to instruct the jury not to consider it.

"THE COURT: Members of the jury, disregard the last statement made by the prosecutor.

"MR. HENSLEY: I also ask the Court to grant a mistrial because of the egre-

gious error that the prosecutor has committed.

"THE COURT: Overruled."

Appellant contends that this argument impermissibly injected the opinion of the prosecutor into evidence and also amounted to unsworn testimony by the prosecutor.

We agree that the argument about personally crying was improper and should not have been made, however, we cannot conclude that it was of such a nature that the trial court's instruction to disregard did not cure the error. See *Mathews v. State*, 635 S.W.2d 532 (Tex.Cr.App.1982); *Goocher v. State*, 633 S.W.2d 860 (Tex.Cr.App.1982); *DeBolt v. State*, 604 S.W.2d 164 (Tex.Cr. App.1980). *Cf. Carter v. State*, 614 S.W.2d 821 (Tex.Cr.App.1981). We overrule these grounds of error.

In another ground of error appellant contends that the prosecutor commented on appellant's failure to testify.

■ The complained of argument occurred during the guilt-innocence phase of the trial and was as follows:

"... She can call other liars like her brother. She can bring any piece of evidence she wants. She can give any piece of evidence to Mr. Queen."

During the presentation of evidence, Queen, the questioned documents examiner, was asked by appellant to examine a piece of evidence. Queen was instructed by the trial court to make such an examination. Appellant also called her brother to testify about a gun and in rebuttal the State proved that it was impossible for the brother to have owned the gun he identified in court on the date he stated he owned it.

In view of the facts and circumstances of this case, we cannot conclude that the complained of argument was a comment on appellant's failure to testify. The complained of comment was not a direct comment on appellant's failure to testify which is manifestly improper. Article 38.08, V.A. C.C.P.

"It is well settled in this state that for the argument or comment to offend against Article 38.08, supra, the language used must be looked to from the standpoint of the jury, and the implication that the language used had reference to the accused's failure to testify must be a necessary one. The test is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the accused's failure to testify. The facts and circumstances of each case must be analyzed to determine whether the language used was of such character. *Bird v. State*, 527 S.W.2d 891 (Tex.Cr.App. 1975)."

No error is shown.

■ In two related grounds of error appellant contends that the trial court erred in limiting the testimony at the punishment hearing. Gay Nell Bellamy, appellant's sister, was called to testify by appellant. Bellamy was not permitted to give her opinion as to what kind of life appellant would lead if the jury was to grant probation. Outside the presence of the jury, Bellamy testified:

"Well, I think she will get a job compatible with her education as a bookkeeper. She's got an almost eighteen year old daughter that's graduating from high school this month. I think she will try to help her get through college."

Vanessa Cloninger, appellant's daughter, was also called to testify. Cloninger had given birth to a child shortly before the offense. Appellant attempted to elicit before the jury that she had visited Cloninger before and after the birth. This testimony was excluded pursuant to an objection by the State. Outside the presence of the jury, Cloninger was permitted to testify that appellant, her mother, was with her when the baby was brought home from the hospital.

The testimony of Bellamy as to what appellant would do if granted probation was pure opinion and speculation on her part.

No error is shown in excluding that testimony.

■ The record also reveals that the fact that appellant had gone to visit Cloninger was put into evidence by the State during the guilt-innocence phase of the trial through the testimony of Roma Knapp. No error is shown in excluding that testimony since it was already before the jury.

■ Appellant also contends in two related grounds of error that the trial court erred in excluding testimony that would have explained the absence of appellant's mother and father at the trial.

By way of a bill of exceptions, appellant, through her sister, Gay Nell Bellamy, showed that appellant's parents were elderly, lived in Fort Worth, were in poor health, and could not have made the trip to Houston to testify on behalf of appellant. She argues that she should have been permitted to explain to the jury why these "natural" witnesses were not present to testify and further argues that this testimony was admissible and relevant to appellant's motion for probation and to mitigate punishment.

This court is at a loss as to how the presence or absence of appellant's parents in the courtroom was relevant to her motion for probation or to mitigate punishment. While their poor health may have generated sympathy for them, there is nothing in the record to show that sympathy should also be applicable to appellant. The absence and the health of appellant's parents was not relevant to any issue the jury was asked to decide, and the trial court did not err in excluding such testimony.[4] We overrule these grounds of error. See and compare *Stiehl v. State*, 585 S.W. 2d 716 (Tex.Cr.App.1979).

---

**4.** We note that there was nothing to indicate that appellant in any way cared for or supported her parents in the line of questioning developed by appellant. That would obviously present another issue.

■ In another ground of error appellant contends that the trial court erred when it denied appellant the opportunity to rehabilitate her brother, Gene Stewart, after his testimony had been impeached by the State.

Stewart testified that in early November of 1978 he had loaned appellant a .38 caliber revolver because her gun had been stolen. Stewart's gun was a R.G. model. Stewart said that appellant returned the gun to him on December 9, 1978. He further testified that he had the gun in his possession after December 9, 1978.

In rebuttal, the State proved that the gun identified by Stewart had been in the possession of the Big "O" Pawn Shop in Fort Worth from October 14, 1978 to December 1, 1978, when it was sold to a Clyde Morstrum. The gun was re-acquired by the Big "O" Pawn Shop on December 18, 1978 and sold to an Albert Sidney Jones on March 9, 1979.

Stewart was recalled by appellant and he testified in the presence of the jury and explained that he had another pistol just like the one he had identified as being loaned to appellant. He then explained that he must have loaned the other one to appellant.

Upon cross-examination of Stewart it was developed, in front of the jury, that the State had obtained a complete history of the firearm in question and that Stewart became aware of that evidence soon after he had testified initially.

Appellant then attempted to show what Stewart had done after he had testified originally concerning the gun once he learned the history of the firearm he identified as being loaned to appellant between early November 1978 and December 9, 1978. This evidence was excluded.

Appellant was permitted to prove up a bill of exceptions as to what the excluded testimony would be:

"Q Mr. Stewart, last Friday at 2:00 o'clock when the Court adjourned, what did you do immediately upon leaving the courtroom?

"A Went to your office.

"Q All right. And did you bring anything with you to the office?

"A Yes, I did.

"Q What did you bring to the office?

"A The other .38 pistol that I owned.

"Q What kind of gun was that?

"A R.G. Model 40.

"Q Where did you get that pistol?

"A Bought it in LaMarque in May of '78.

"Q Where did you get that pistol last Friday?

"A Out of my car.

"Q Is this the same pistol you had reference to on cross examination when you said you had another pistol just like Defendant's Exhibit No. 3?

"A Yes, it is.

"Were you told by defense counsel to get yourself down there and verify what you said on the stand under oath by bringing that pistol to my office?

"A Yes.

"Q What time did you get to my office?

"A I got to your office around 2:30 or 3:00 o'clock.

"Q And you had what kind of gun with you?

"A R.G. Model 40 .38 caliber revolver two-inch barrel.

"MR. ISBELL: That's what we would hope to show to the jury, your Honor, and that concludes our bill."

Appellant contends that she should have been permitted to show that Stewart owned two very similar guns and that his identification of the gun in question was not fraud upon the jury but a mistake.

However, the record clearly reflects that Stewart, in front of the jury, was permitted to recant his earlier identification of the pistol in question by explaining that he owned two pistols and that he identified the wrong one. The error, if any, was harmless. See *DeRusse v. State*, 579 S.W.2d 224, 233 (Tex.Cr.App.1979).

In two related grounds of error appellant contends that the trial court erred in the wording of the circumstantial evidence charge given to the jury. Without more, we note that a charge on circumstantial evidence is no longer required in criminal jury trials in Texas. See *Hankins v. State*, 646 S.W.2d 191 (Tex.Cr.App.1983). These grounds of error are overruled.

The judgment is affirmed.

MILLER and CAMPBELL, JJ., concur.

CLINTON, J., dissents for reasons stated by the Court in *Hurd v. State*, 725 S.W.2d 249, 253 (Tex.Cr.App.1987), and in his concurring opinion in *Koehler v. State*, 679 S.W.2d 6, 11 (Tex.Cr.App.1984).

TEAGUE, Judge, dissenting.

The majority opinion holds appellant's grounds of error numbered two, three, and four are not subject to appellate review because "appellant has not shown what answers she expected to elicit from T.C. Jones" [, a State's witness], (Page 861), and further finds that appellant "did not perfect a bill of exceptions or make offer of proof in accordance with Article 40.09, § 6(d)(1), V.A.C.C.P." (Page 861).

Appellant asserts in her three grounds of error that the trial court "jeopardized the integrity of the fact finding process by denying appellant the right to develop on cross-examination of T.C. Jones" information concerning the following subjects: (1) "his involvement with other women which might have supported others with a motive to kill T.C. Jone's wife ..."; (2) "whether he had an 'open marriage' [with his now deceased wife] in that his involvement with another woman would be acceptable to the deceased ..."; and (3) sought through the cross-examination of T.C. Jones whether there was "any involvement with other men by [Jones's] wife (the deceased) which might have suggested other people with a strong motive for her death ..."

As the excerpts set out in the majority opinion reflect, appellant wanted to, but could not because of the trial judge's sustaining the prosecutor's objections, establish the fact that Jones was a philanderer, as well as the fact that Jones's wife might not have objected to Jones being a philanderer, as well as the fact that Jones's wife was also a philanderer, and their philandering might have caused a jilted lover to have just as strong a motive as appellant had to kill Jones's wife. The excerpts make it clear to me that the trial judge was not going to let appellant question Jones about these subjects, either in or outside of the presence of the jury. The majority declines to review the above three grounds of error on the basis that because appellant did not make an "offer of proof" there was nothing to review. I disagree.

Because I find that appellant has more than adequately preserved his complaints for appellate review, I must disagree with the majority opinion that appellant's claims are not properly before this Court for review. In disagreeing with the majority opinion, however, this does not mean that I also find that her contentions have sufficient merit that would warrant this Court reversing her conviction. I simply find at this time that her contentions are properly before this Court for review purposes, and they should be reviewed by this Court. It is to the failure of this Court to review the above grounds that causes me to file this dissenting opinion.

The majority opinion obviously fails to draw the distinction between the situation where the accused desires to elicit certain, specific responses from a State's witness on cross-examination, and is precluded from doing so by the trial court, and the situation where the accused wishes to cross-examine a State's witness about a certain general subject that might show some relevant fact that would bring into question the credibility of the witnesses's testimony. In the former, it is incumbent upon the accused to establish on the record, either through the witness himself or herself, answers to specific questions directed at the witness, or through an offer of proof

of the questions and the answers. However, that is not true when it comes to the trial judge precluding the accused from questioning the witness about certain general subjects. In that instance, the rule is more liberal; it is only necessary for the accused to show that his cross-examination would have affirmatively established the fact sought to be proved; the accused must merely establish what subject matter he desired to examine the witness about during the cross-examination. See the discussion on these subjects that is set out in *Koehler v. State*, 679 S.W.2d 6 (Tex.Cr. App.1984); *Virts v. State*, 739 S.W.2d 25 (Tex.Cr.App. No. 1169–84, October 21, 1987); and *Hurd v. State*, 725 S.W.2d 249 (Tex.Cr.App.1987).

In this instance, I find from the record that appellant wanted to question the witness Jones about the general subject of philandering, as might be applicable to both Jones and his wife, and given the record before us he properly perfected his error for appellate review purposes.

Appellant argues that the actions of the trial judge prevented her from establishing through Jones the fact that others might have had the same motive as she had that might have caused them to be responsible for the death of Jones's wife, for which appellant was convicted of causing. The State argues that appellant's sought after cross-examination was not permissible as it could not have affected Jones's credibility as a witness. Given the state of the record before us, these are the issues this Court should be addressing, and not whether the error was perfected for appellate review. Because the majority does not address appellant's grounds of error, I respectfully dissent.

Given the author's penchant for religiously subscribing to and following what he said for the Court in *Allaben v. State*, 418 S.W.2d 517 (Tex.Cr.App.1967), and *Allaben's* progeny, as to what is admissible at the punishment stage of non-capital case, which this case concerns, I am at a loss to understand how he can dispose of appellant's grounds of error numbered 10 through 13, inclusive, in the manner he does.

I am terribly concerned about the way that the majority opinion disposes of appellant's complaint that the trial judge did not err in refusing to allow the jury to hear testimony as to why appellant's father and mother were not present at the trial.

This Court has decided many, many cases, too many to cite, where it approved a prosecuting attorney making a big deal to the jury about the absence of family members of the defendant from the punishment phase of the trial. Here, I find that appellant was attempting to cut the prosecutor off from arguing, to the effect, that the absence of appellant's father and mother from the trial shows that not even they cared whether the jury voted to send her to the penitentiary.

In *Bodde v. State*, 568 S.W.2d 344, 351–352 (Tex.Cr.App.1978), this Court approved a prosecuting attorney testifying before the jury concerning why a child witness was unable to testify at the defendant's trial, and held: "The court acted properly in allowing the State to explain its failure to produce the child as a witness. (Citations omitted.)." Doesn't a good rule of law work both for the State and the defendant?

For the above and foregoing reasons, I am constrained to dissent to the way that the majority opinion overrules appellant's above grounds of error.

DUNCAN, Judge, dissenting.

Interpreting what the trial court instructed the appellant to do after it refused to permit him to perfect his bill of exception, the majority states: "[t]he trial court instructed appellant to dictate into the record what the expected answers of T.C. Jones would have been." (P. 861). That is an erroneous mischaracterization of the court's instructions. The trial court told the appellant: *"[I] want you to dictate in the record what you expect to prove."* (P.

860). Complying with the trial court's instructions the appellant did just that.

For the majority to reject a substantive review of the appellant's points of error regarding the limitation of his cross-examination of T.C. Jones on the grounds that his alleged error was not preserved misconstrues the record. Consequently, I dissent.