Affirmed and Opinion filed September 23, 2003
















Affirmed and
Opinion filed September 23, 2003.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00354-CR

____________

 

HECTOR MANUEL SANTOS, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

_______________________________________________________

 

On Appeal from
the 185th District Court

Harris County, Texas

Trial Court
Cause No. 870,501

 

_______________________________________________________

 

O P I N I O
N

            Appellant Hector Manuel Santos
appeals his aggravated-robbery conviction, arguing in four issues that: (1)–(2)
the trial court erroneously denied his motion to suppress in-court and
out-of-court identification testimony after police used an impermissibly
suggestive pretrial identification procedure; and (3)–(4) the evidence is
legally and factually insufficient to prove appellant participated in the
robbery.  We affirm.








                              I.  Factual and Procedural Background

            The
complainant, Jose Gonzalez, and about nine other men were socializing in the
early morning hours at a one-bedroom apartment in southwest Houston.  Several of the men were in the bedroom
playing cards around a card table, while the others watched television and
conversed in the living room.  At
approximately 2:00 or 2:30 in the morning, five armed men
broke through the front door of the apartment. 
Their weapons included a handgun, a large gun that looked like an Uzi, and
a machete or an ax.  One of the intruders
was wearing a mask over his face.  The
intruders ordered the occupants of the apartment to drop to the ground.  They warned their victims not to look up at
their faces unless they wanted to be shot. 
The intruders collected jewelry, money, and other possessions from the
men, and then fled.

            Luis Paz, one of the robbery
victims, identified appellant as the intruder who carried the Uzi.  Another victim also identified
appellant.  A jury found appellant guilty
of aggravated robbery and sentenced him to 99 years’ confinement in the Texas
Department of Criminal Justice, Institutional Division and imposed a $10,000
fine.

                                                       II.  Issues Presented

            Appellant presents four issues for
review:

            (1)       Should the
trial court have suppressed Luis Paz’s out-of-court identification of appellant
because it resulted from an allegedly unduly suggestive procedure?

            (2)       Should the
trial court have suppressed Luis Paz’s in-court identification of appellant
because it was tainted by an allegedly unduly suggestive pretrial
identification procedure?

      (3)–(4)     Is the evidence legally and factually
insufficient to support appellant’s aggravated-robbery conviction when the
complainant’s testimony incriminating appellant was not credible?




 








                                               III.  Analysis and Discussion

A.        Did an unduly suggestive pretrial identification procedure
render a witness’s in-court identification inadmissible? 

 

            In his second issue, appellant
argues the trial court should have suppressed Paz’s in-court identification
because it was tainted by the identification procedure appellant claims was
unduly suggestive.  An
in-court identification is inadmissible if it has been tainted by an
impermissibly suggestive pretrial identification procedure.  Ibarra v. State, 11 S.W.3d 189, 195 (Tex. Crim.
App. 1999).  We perform a two-step
analysis to determine whether the trial court erroneously admitted in-court
identification testimony, inquiring: (1) whether the pretrial procedure was
impermissibly suggestive; and (2) if so, whether the suggestive pretrial
procedure gave rise to a very substantial likelihood of irreparable
misidentification at trial.  Delk v. State, 855 S.W.2d
700, 706 (Tex. Crim. App. 1993).  It is appellant’s burden to prove the
in-court identification is unreliable by proving both of these elements by
clear and convincing evidence.  See id. 
If the indicia of reliability outweigh the influence of an impermissibly
suggestive pretrial identification, the identification testimony is
admissible.  Id.

                        1.         Suggestiveness of the Home Video

            We must first determine whether the
pretrial lineup procedure used with Paz was impermissibly suggestive.  Paz tentatively identified appellant as one
of the robbers in a videotaped lineup. 
After Paz made this tentative identification, police showed him a home
video found in appellant’s car.  After
viewing this video, Paz was able to positively identify appellant.  Appellant argues this procedure was unduly
suggestive because appellant is the only person who appears in both the videotaped
lineup and the home video.  Appellant
maintains this procedure communicated to Paz that police thought appellant was
one of the robbers.  Having carefully
reviewed both tapes, we conclude this pretrial identification procedure was
impermissibly suggestive.

            The manner or the content of a
pretrial identification procedure may render it impermissibly suggestive.  See
Barley v. State, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995). Though it may be necessary in some
circumstances to show a witness more than one photograph of a defendant who has
“different looks,” it is generally considered suggestive to show a witness
several photographic arrays or lineups in which only the defendant’s
photograph  recurs.  See
Cantu v. State, 738 S.W.2d 249, 252 (Tex. Crim. App. 1987). 
The recurrence of the defendant’s photograph tends to bring attention to
him and might suggest to the witness that police believe or suspect the
defendant is the culprit.  See id. 
Similarly, “the use of a lone photograph, without any of the traditional
safeguards of a lineup or a photographic array, is inherently suspect” and has
been widely condemned by courts.  Loserth v. State, 985 S.W.2d
536, 543 (Tex. App.—San Antonio 1998, pet. ref’d).

            In the instant case, Paz first
viewed a videotaped lineup featuring appellant and four other dark-complected young men. 
The lineup was filmed at the Harris County Jail.  Appellant stood in the second position.  To keep appellant from standing out because
of his braided hair, all of the lineup participants wore shower caps.  Paz told police the person in the second
position on the tape (appellant) looked like one of the robbers, but he was not
certain.  Police then showed Paz the videotape
found in appellant’s car when appellant was arrested approximately two weeks
after the robbery. 

            Appellant is the only person who
appears in both the videotaped lineup and the home video found in appellant’s
car.  The running time of the home video
is approximately thirty-five minutes and it has low-quality sound, which was
turned down when Paz viewed the tape. 
The home video prominently features appellant and contains seven
distinct scenes ranging in duration from approximately one to seven minutes
each.  Although Paz
viewed the entire tape, he positively identified appellant as one of the
robbers during the opening scene in which appellant is shown browsing in the
shoe department of a store.  The
opening scene lasts about six minutes and appellant is wearing dark blue jeans,
a navy blue shirt, conspicuous gold earrings, a thick gold chain, and other
jewelry.  The scene includes several
close-up shots of appellant and he is the only person shown until a store clerk
approaches him about three minutes into the tape.  

            In the second scene of the home
video, which lasts about four minutes, appellant and a dark-complected
male companion make a purchase at a liquor store and then walk to appellant’s
car.  Appellant and his companion
apparently took turns filming each other because they never both appear on the
film at the same time.  Like appellant,
the companion has braided hair and is wearing jeans and a navy blue shirt, but
the companion has a lighter complexion than appellant.  Once inside the car, only appellant is
shown.  During about thirty seconds of
footage in the car, appellant removes a handgun from the glove compartment,
shows it to the camera, and then gestures with it.  

            The third segment of the home video
lasts about four minutes and shows appellant and the same companion at a drug
store.  Appellant is shown interacting
with a clerk at the photograph counter. 
During the last two minutes of this scene, appellant is behind the
counter with the clerk until the clerk motions for appellant to return to the
customer area. 

            The fourth scene is also
approximately four minutes long and it shows only appellant and traffic
footage.  In this scene, appellant is
shown driving and then drinking from a liquor bottle.  He also is shown dancing and talking to the
camera.  

            The fifth scene lasts about one
minute.  It shows the same male companion
entering a large clothing store and looking around.  

            The sixth scene consists of about
seven minutes of footage, filmed at night in a parking lot near a gas
station.  About six men are sitting on
cars, standing around, and drinking what appears to be beer.  Appellant arrives approximately three minutes
into the scene.  Appellant talks to the
camera and there are several close-up shots of him.  At one point, one of the other men, wearing a
white shirt, removes a gun from the trunk of one of the cars and briefly shows
it to the camera.  Due to the poor
lighting, it is unclear from the tape whether the man in the white shirt is
appellant’s companion from the previous scenes. 
         The seventh scene is about
three minutes long and features appellant sitting on a couch next to another
young, dark-complected man.  There is a young woman reclining on an
adjacent couch and the scene alternates between close-up shots of appellant and
close-up shots of the young woman.  After
the final scene, there is additional footage, apparently filmed at very close
range, showing a music video that was playing on a television screen.  After the music video, there is brief footage
of small children playing basketball inside a gymnasium.  

            We find the home video was unduly
suggestive.  See Cantu, 738 S.W.2d at 252.  Though the police may have believed it
necessary to show Paz a second image of appellant because the shower cap
rendered it difficult to recognize him in the police video lineup, the means  selected
brought attention to appellant and might have suggested to Paz that the police
believed appellant to be the culprit. 
Appellant is the only person from the police video lineup who is also in
the home video, and appellant is featured prominently throughout the home video.  In some scenes, appellant’s actions might
suggest he is a criminal or a gangster. 
Showing Paz the home video, after he tentatively identified appellant in
the police video lineup, was at least equivalent to showing Paz a lone
photograph of appellant or a series of lineups in which only appellant’s
photograph recurred.  Accordingly, we
conclude the identification procedure was unduly suggestive.

            2.         Reliability of In-Court Identification

            Having
determined the pretrial identification procedure was impermissibly suggestive, we now perform the second step of the analysis
and determine whether the procedure rendered Paz’s identification unreliable
under the totality of the circumstances. 
In conducting this analysis, we must weigh the corrupting effect of the
impermissibly suggestive pretrial lineup procedure against the following
factors to determine whether the in-court identification is admissible:  

(1)       the opportunity of the witness to view the criminal at the
time of the crime; 

(2)       the witness’s degree of attention; 

(3)       the accuracy of the witness’s prior description of the
criminal; 

(4)       the level of certainty demonstrated by the witness at the
time of the confrontation; 

(5)       and
the lapse of time between the alleged act and the time of the confrontation.  

 

Ibarra v. State, 11 S.W.3d at 195. 
This list of factors is not exhaustive, so we may also consider the
following additional factors: 

(1)       any identification prior to the lineup of another person; 

(2)       the identification by photograph of the defendant prior to
the lineup; and 

(3)       any failure to identify the defendant on a prior
occasion.   

 

Barley, 906
S.W.2d at 35, n. 8; Brown v. State,
29 S.W.3d 251, 254–55 (Tex. App.—Houston [14th Dist.] 2000, no pet.). 
Because all of these factors are issues of historical fact, we weigh
them deferentially in a light favorable to the trial court’s ruling.  See
Ibarra, 11 S.W.3d at 195–96.  We then weigh the factors, viewed in this
light, de novo “against the ‘corrupting effect’ of the suggestive identification
itself.”  Id.

            The violent intrusion and subsequent
robbery occurred very quickly. 
Nonetheless, the record shows Paz had sufficient opportunity to observe
the intruder who was carrying the Uzi. 
Paz was standing in the bedroom doorway looking toward the front door of
the apartment when the intruders kicked down the front door.  The bedroom door was across the living room
from the front door, separated by a distance of about eight feet.  Because the intruders had to cross the living
room before reaching the bedroom, the witnesses in the bedroom had a greater
opportunity to view them than the witnesses in the living room whom the
intruders immediately told to drop to the ground.  One of the intruders held a handgun to Paz’s
head and told him to drop to the floor unless he wanted to be shot.  Out of surprise, Paz froze for a moment and
ignored the intruder’s instruction.  In
this moment, a second intruder, whom Paz later would identify as appellant,
entered the bedroom area wielding a large automatic weapon that Paz described
as an Uzi.  The intruder with the Uzi was
approximately three feet away from Paz, and Paz dropped to the ground at the
sight of him.        Although Paz was not able to observe the Uzi-armed intruder for
an extended period of time, he was attentive enough to provide a height
estimate of 5'10'' for the police.  At
trial, Officer Ebers of the Houston Police Department
testified that appellant is that precise height, which supports the reliability
of Paz’s identification.  See Delk, 855
S.W.2d at 706 (finding identification reliable when witness saw robber in his
car at four-way traffic stop for about fifteen seconds and stating length of
encounter is relevant consideration but not controlling); Brown, 29 S.W.3d at 255 (finding identification reliable when
entire burglary lasted less than a minute and eyewitness saw intruder’s face
for only a few seconds).  In his trial
testimony, Paz also recounted that the intruders argued with one man who begged
them not to take his wedding band. 
Ultimately, the intruders did not take the band because the man could
not remove it from his finger.  Paz’s
ability to recount this exchange between the robbers and one of the men shows
Paz’s high degree of attention at the time of the robbery. 

            The record does not show any
discrepancy between Paz’s pre-identification description of the Uzi-armed
intruder and appellant’s description. 
The only arguable discrepancy would be that Paz described the robbers as
speaking with a Columbian accent, but appellant testified he was born in Puerto
 Rico and moved to the continental United
 States approximately twelve years before
trial.[1]  This slight discrepancy does not rise to the
level that would weigh against a finding of reliability because the record
suggests appellant is actually Columbian. 
Officer Pedro Moreno of the Houston Police Department testified that, in
an unsolicited conversation, appellant told Moreno he was
from Columbia and did
not want to return to Columbia. 

            Paz’s certainty regarding his
in-court identification can be inferred from how Paz reacted to seeing
appellant in the courtroom during trial. 
Paz testified it was difficult for him to look in appellant’s direction
in the courtroom because it caused him to remember the night of the robbery and
to feel rattled.  The record does not
show that Paz failed to identify appellant as one of the robbers on any
occasion prior to viewing the home video. 
Nor does the record show that Paz previously identified any other person
as the Uzi-armed intruder.  Rather, when
Paz viewed the videotaped lineup of five men wearing shower caps, appellant
tentatively identified appellant as the intruder who brandished the Uzi.  Moreover, Paz made his in-court
identification of appellant thirteen months after the robbery and testified his
identification in this case was based on what he saw at the time of the
robbery.  Id. (identification admissible if ability to identify has independent origin
from pretrial procedure). 
This relatively short lapse between the robbery and the time of the in-court
identification, Paz’s consistent testimony, and Paz’s lack of difficulty in
remembering the robbery events, are additional indicia that his in-court
identification of appellant was reliable. 
See, e.g., Delk, 855 S.W.2d at 705–08
(finding eighteen-month time span between robbery and in-court identification
did not undermine reliability because witness remembered details and provided
consistent testimony).

            Weighing this evidence of
reliability against the unduly suggestive home video shown to Paz before his
positive identification of appellant, we conclude no substantial risk of
irreparable misidentification was created so as to deny appellant due
process.  See Ibarra, 11 S.W.3d at 195–96; Delk, 855 S.W.2d
at 706.  Accordingly, we find the trial
court did not abuse its discretion by allowing Paz’s in-court
identification.  Therefore, we overrule
appellant’s second issue.

B.        Did an unduly suggestive pretrial
identification procedure render testimony about a witness’s out-of-court
identification inadmissible?

 

            In his
first issue, appellant argues the
trial court should have suppressed testimony regarding Paz’s out-of-court
identification of appellant because it resulted from the same unduly suggestive
pretrial identification procedure.  In determining
the admissibility of the out-of-court identification, the cases indicate that
we apply a nearly identical two-step analysis, inquiring: (1) whether the
pretrial identification procedure was impermissibly suggestive, measuring
suggestiveness by the same criteria as is used in the in-court identification
context; and (2) if the pretrial procedure was impermissibly suggestive,
whether it gave rise to a very substantial likelihood of
misidentification.  See Neil v. Biggers, 409 U.S. 188, 198,
109 S.Ct. 375, 381–82, 34 L.Ed.2d
401 (1972).  In analyzing the
second prong, we apply the same reliability factors used to assess the
reliability of in-court identifications. 
See Barley, 906
S.W.2d at 35, n. 8; Brown, 29
S.W.3d at 254–55.

            For the reasons set forth above, the
pretrial identification procedure was impermissibly suggestive.  In making the requisite assessment under the
second prong, we find the application of the factors to the out-of-court
identification differs in only two respects from our application of the factors
to the in-court identification — (1) the level of certainty demonstrated at the
time of the confrontation and (2) the lapse of time between the robbery and the
confrontation.  Accordingly, in weighing
the reliability of the out-of-court identification, we disregard Paz’s
certainty at trial that was manifested by his unease when he looked in
appellant’s direction in the courtroom. 
Paz made a tentative identification of appellant when he saw him in the
video lineup.  Paz and Officer Ebers both testified Paz was certain of his identification
of appellant when he viewed the home video later the same day.  Officer Ebers, who
had observed Paz while Paz watched the home video, testified that within the
first three minutes of the tape, Paz began shaking his head as though he
recognized appellant.  Paz informed
Officer Ebers that appellant was definitely one of
the intruders.[2]  The out-of-court identification took place
only 35 days after the robbery, and Paz had not been shown other images of
appellant during the intervening time period. 
See Ibarra, 11
S.W.3d at 196.  

            Weighing this evidence of
reliability against the unduly suggestive pretrial identification procedure, we
conclude the procedure did not give rise to a very substantial likelihood of
misidentification so as to deny appellant due process.  Accordingly, we find the trial court did not
abuse its discretion by failing to suppress Paz’s out-of-court
identification.  Therefore, we overrule
appellant’s first issue.

C.        Is the evidence legally and factually sufficient to prove
appellant was one of the robbers?

 

            In his third and fourth issues,
appellant challenges the legal and factual sufficiency of the evidence to
support his conviction, arguing the identification testimony of the complainant
named in the indictment, Jose Gonzalez, was not credible.  Appellant makes the same arguments in support
of both of his sufficiency issues.  He
contends the evidence is legally and factually insufficient to prove appellant
was even present during the robbery, citing the following four reasons: (1) a
week before trial Gonzalez allegedly told appellant’s private investigator he
was uncertain that appellant was one of the robbers; (2) there is no
fingerprint evidence linking appellant to the offense; (3) Miguel Hernandez
witnessed the robbery, but could not identify anyone as a participant in the
robbery; and (4) appellant testified at trial and denied any involvement in
this robbery.  




            1.         Sufficiency Standards of Review

            In evaluating a legal-sufficiency
challenge, we view the evidence in the light most favorable to the
verdict.  Wesbrook v. State, 29 S.W.3d 103,
111 (Tex. Crim. App. 2000).  We may not overturn the jury’s verdict unless
it is irrational or unsupported by proof beyond a reasonable doubt.  Matson v. State, 819 S.W.2d 839,
846 (Tex. Crim. App. 1991).  The jury, as the trier
of fact, “is the sole judge of the credibility of the witnesses and of the
strength of the evidence.”  Fuentes v. State, 991 S.W.2d 267, 271 (Tex. Crim.
App. 1999).  The jury
may choose to believe or disbelieve any portion of the witnesses’ testimony.  Sharp v. State, 707 S.W.2d 611, 614
(Tex. Crim. App. 1986).  When faced with conflicting evidence, we
presume the trier of fact resolved conflicts in favor
of the prevailing party.  Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).  Therefore, if any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt, we must affirm.  McDuff v. State, 939 S.W.2d 607, 614 (Tex. Crim.
App. 1997).  The
question is not whether a rational jury could have entertained a reasonable
doubt of guilt, but whether it necessarily would have done so.  Swearingen
v. State, 101 S.W.3d 89, 96 (Tex. Crim. App. 2003). 

            When evaluating a challenge to the
factual sufficiency of the evidence, we view all the evidence without the prism
of “in the light most favorable to the prosecution” and set aside the verdict
only if it is “so contrary to the overwhelming weight
of the evidence as to be clearly wrong and unjust.”  Johnson v. State, 23 S.W.3d 1, 6–7 (Tex. Crim. App. 2000).  This concept embraces both “formulations
utilized in civil jurisprudence, i.e., that evidence can be factually
insufficient if (1) it is so weak as to be clearly wrong and manifestly unjust
or (2) the adverse finding is against the great weight and preponderance of the
available evidence.”  Id. at 11.  Under this
formulation, we essentially compare the evidence which tends to prove the
existence of a fact with the evidence that tends to disprove that fact.  Jones v. State, 944 S.W.2d 642, 647 (Tex. Crim.
App. 1996).  In conducting the
factual-sufficiency review, we must employ appropriate deference so that we do
not substitute our judgment for that of the fact finder.  Id. at 648.  Our evaluation
should not intrude upon the fact finder’s role as the sole judge of the weight
and credibility given to any witness’s testimony.  Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim.
App. 1997).  In
conducting a factual sufficiency review, we must consider and address the
appellant’s main argument for a finding of insufficiency.  Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  This practice benefits the parties, maintains
the integrity of the justice system, and improves appellate practice.  Id.  We find the evidence factually insufficient
only when necessary to prevent manifest injustice.  Cain,
958 S.W.2d at 407.    

            2.         Sufficiency Analysis

            A person commits the felony offense
of aggravated robbery when:  (1) in the
course of committing theft; (2) with intent to obtain and maintain control of
property; (3) he knowingly or intentionally; (4) threatens or places another in
fear of imminent bodily injury or death; and (5) then and there uses or
exhibits a deadly weapon.  See Tex.
Pen. Code §§ 29.02(a)(2),
29.03(a)(2); see also Robinson v. State,
596 S.W.2d 130, 132 (Tex. Crim. App. 1980).  Because the jury was charged on the law of
parties, it could have reached its verdict by deciding the other robbers
committed the elements of the offense and appellant, acting with intent to
promote or assist the commission of the aggravated robbery, solicited,
encouraged, directed, aided, or attempted to aid the others to commit the
robbery.  See Tex. Pen.
Code § 7.02(a).


            After thoroughly reviewing the
evidence, we conclude that a rational trier of fact
could have found appellant guilty beyond a reasonable doubt.  Eyewitness testimony and circumstantial
evidence showed appellant was one of the five intruders who forcibly entered
the apartment where Gonzalez, Paz, and others were socializing.  The evidence shows that appellant, wielding a
large gun that looked like an Uzi, entered the bedroom of the apartment.  The occupants of the bedroom were told to
drop to the ground, and they were robbed of their money, jewelry, and other
possessions.  The robbers told the
occupants not to look at them unless they wanted to be shot and then stripped
of their clothing.  Paz and Gonzalez both
testified that they feared they would be killed.  

            Gonzalez was inside the bedroom when
the robbery took place.  About two weeks
before Paz identified appellant, Gonzalez positively identified appellant after
viewing him in the lineup conducted at the Harris County Jail.[3]  Like Paz, Gonzalez identified appellant as
the intruder who entered the bedroom with a large black gun that looked like an
Uzi.  Both Paz and Gonzalez testified
that appellant was not wearing a mask or anything else to conceal his
face.  Police admonished both Gonzalez
and Paz before viewing the lineup, that the persons in
the lineup may or may not have been involved in the robbery.  Gonzalez and Paz were also admonished not to
discuss with any other person the identifications, if any, they made.  The record does not contain any evidence that
Gonzalez or Paz disregarded these instructions.

            Circumstantial evidence relating to
the guns used in the robbery corroborated the identification testimony and
pointed to appellant’s guilt.  Gonzalez
testified that the handgun held to his head was black and had a square
shape.  He also told police that he saw a
gray car speed away after the robbery, but admitted he was uncertain of the
color because he saw the car only briefly and in a dark parking lot.  Appellant was arrested about two
weeks after the robbery.  Police officers
pursued appellant because he was speeding in a silver sedan that had recently
sustained damage and had smoke coming out of its hood.  At the time of the stop, appellant was
intoxicated and tried to escape from police by running away on foot.  He was arrested at a nearby apartment
complex.  Police seized a loaded
nine-millimeter handgun that was in plain view on the passenger-side floor
board of appellant’s car.  This handgun
matches the gun Gonzalez described. 

            Three eyewitnesses described the
robbers’ complexions and accents, giving very similar accounts.  Appellant’s accent matches the description
provided by other eyewitnesses, even though Gonzalez and Paz did not hear
appellant’s voice when they identified him as one of the robbers.  According to Gonzalez’s testimony, the
robbers spoke Spanish with a Columbian or Puerto Rican accent.  Miguel Hernandez, who was in the living room when  the robbery
occurred, and Paz testified that the robbers spoke Spanish with a Columbian
accent.  Appellant’s native language is
Spanish, and as discussed above in the identification analysis, the record
suggests appellant is from Columbia even
though he testified he was born in Puerto Rico.  Moreover, Hernandez, Gonzalez, and Paz all
testified that the robbers had dark, cinnamon color complexions.  Appellant’s complexion matches this
description.

            After appellant’s arrest, police
searched his apartment and found a cellular phone that belonged to
Hernandez.  Hernandez testified that the
robbers took his cellular phone in the heist. 
Hernandez identified the cellular phone found in appellant’s possession
as his (Hernandez’s) cellular phone.  The
custodian of records for Voicestream Wireless also
testified at trial that he traced the serial number of the cellular phone and
found that it did indeed belong to Hernandez. 
When asked about the cellular phone at trial, appellant failed to
provide a coherent explanation for his possession of it.  Appellant first testified that he found
Hernandez’s phone at a party about a week after the robbery occurred.  Later, he testified he found the phone
outside a bar and that it had been “thrown out.”

            After reviewing the record under the
applicable standard, we conclude that the alleged shortcomings in the evidence
do not render it legally insufficient to support appellant’s conviction.  Appellant contends the evidence is legally
insufficient because Gonzalez allegedly admitted to John Castillo,
a licensed private investigator hired by the defense, that he was not certain
appellant was one of the robbers. 
Castillo spoke with Gonzalez on the telephone about a week before trial,
after Castillo’s efforts to obtain Gonzalez’s physical address proved
unsuccessful.  Castillo testified that he
asked Gonzalez questions about his identification of appellant in this case, and
that Gonzalez repeatedly said he was unsure of the identification he made.  According to Castillo, Gonzalez was uncertain
because at the time of the robbery he had consumed five or six beers and had
been awake for a long period of time. 
Castillo further testified that Gonzalez had told the police he was
uncertain when he identified appellant, but that Gonzalez was afraid to clearly
voice his uncertainty to the police.

            On cross-examination, Castillo
conceded a complainant, like Gonzalez, could be startled when contacted on
behalf of the defendant.  Gonzalez
testified he was surprised when Castillo called him because he had made efforts
to keep his phone number confidential. 
According to Gonzalez, Castillo asked him a couple of questions very
quickly and then abruptly ended the conversation.  Gonzalez admitted once on cross-examination
that he told Castillo he was uncertain. However, Gonzalez also testified
several times on cross-examination and direct examination that he was certain
of his pretrial identification of appellant.

            Appellant also urges the evidence is
legally insufficient because there was no fingerprint evidence linking
appellant to the robbery, and because Hernandez could not identify anyone as a
participant in the robbery.  These
arguments lack merit because a rational jury could have found the elements of
the offense beyond a reasonable doubt without fingerprint evidence and without
identification testimony from Hernandez. 
Three police officers testified as to their unsuccessful efforts to
obtain fingerprint evidence from the apartment after the robbery.  Officer Walter Stairhime,
a latent-fingerprints examiner for the Houston Police Department, explained
that in most cases, fingerprint evidence is inconclusive.  Stairhime explained
that contrary to television portrayals of fingerprint testing, a print is not
left every time someone touches an object. 
For example, no prints are left on a surface when a person’s hands are
particularly dry.  Conversely, Stairhime explained, a print that is too moist is usually
smeared and therefore not useful.  In
this case, Stairhime explained the police were unable
to obtain fingerprint evidence left by any of the robbers.  On appellant’s reasoning, this would mean no
one was present at the robbery.  However,
as Stairhime explained, the absence of a person’s
fingerprints at a crime scene does not prove the absence of the person from the
crime scene.

            Likewise, Hernandez’s inability to
identify appellant, or any of the other robbers, hardly proves appellant did
not participate in the robbery. 
Hernandez was in the living room when the robbery occurred.  The front door of the apartment opened
directly into the living room. 
Consequently, those in the living room had less opportunity to view the
intruders than those in the bedroom, because the intruders immediately
instructed the living room occupants to drop to the ground and not look at
them.  Hernandez testified that he was
unable to identify any of the intruders because he dropped to the ground
immediately and heeded their instructions to remain on the ground without
looking at their faces.

            Finally, appellant argues the
evidence is legally insufficient because he testified he was not involved in
the robbery.  Appellant did not offer an
alibi, and was impeached, on cross-examination, with four prior inconsistent
statements he had given to the police. 
It was the jury’s duty to resolve conflicting evidence in this
case.  See Anderson v. State, 701 S.W.2d 868, 872–73 (Tex. Crim. App. 1985); see
also Heiselbetz v. State, 906 S.W.2d 500, 504
(Tex. Crim. App. 1995) (“Reconciliation of conflicts
in the evidence is within the exclusive province of the jury.”).  The jury had before it all of the relevant
information concerning the identification of appellant, and, as fact finder,
the jury had the duty to determine the credibility of the witnesses’ testimony
and to decide the weight to be given the evidence.  See
Garza v. State, 633 S.W.2d 508, 514 (Tex. Crim.
App. 1981) (opin. on reh’g);
see also Carr v. State, 694 S.W.2d
123, 128 (Tex. App.—Houston [14th Dist.] 1985, pet. ref’d).  Whether considered alone or in conjunction
with appellant’s other arguments for legal
insufficiency, appellant’s testimony did not render it impossible for a
rational trier of fact to find appellant committed
aggravated robbery either alone, or as a party to the offense.  See McDuff, 939 S.W.2d at 614; Davis v. State, 831 S.W.2d 839,
842 (Tex. App.—Dallas 1992, pet. ref’d).  Therefore, we find the evidence is legally
sufficient to sustain appellant’s aggravated-robbery conviction.  Accordingly, we overrule appellant’s third
issue.   

            Applying the factual-sufficiency
standard of review, we cannot conclude the jury’s verdict is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust.  See
Johnson, 23
S.W.3d at 6–7.  Accordingly, we
overrule appellant’s fourth issue as well.

                                                             IV.  Conclusion

            Although the home video the police
showed to Paz was impermissibly suggestive, the trial court did not err by
admitting Paz’s in-court and out-of-court identification testimony because the
totality of the circumstances showed the unduly suggestive pretrial procedure
did not give rise to a very substantial likelihood of misidentification.  Finally, because we find the testimony of two
eyewitnesses and the circumstantial evidence in this case were
sufficient to establish appellant’s guilt, we overrule appellant’s challenges
to the legal and factual sufficiency of the evidence.  We affirm the trial court’s judgment.

                                                                                    

                                                                        /s/        Kem Thompson
Frost

                                                                                    Justice

 

Judgment rendered and Opinion filed September 23, 2003.

Panel
consists of Justices Yates, Hudson, and Frost.

Publish — Tex. R. App. P. 47.2(b).

 

 











            [1]  The record does not indicate whether
appellant moved to the continental United
 States directly from Puerto
 Rico.





            [2]  Paz viewed the remainder of the home video
and later told Officer Ebers he believed one of the
other men in a scene closer to the end of the home video also might have been
one of the intruders.





            [3]  Gonzalez viewed the live lineup of which Paz
was shown a videotape.